**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EARL MATTHEWS, JR.,
Petitioner-Appellant,

v.

PARKER EVATT, Commissioner,

No. 96-5

South Carolina Department of
Corrections; T. TRAVIS MEDLOCK,
Attorney General, State of South
Carolina,
Respondents-Appellees.

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
G. Ross Anderson, Jr., District Judge.
(CA-95-132-3-3BC)

Argued: December 2, 1996

Decided: January 28, 1997

Before WIDENER and HAMILTON, Circuit Judges, and
PHILLIPS, Senior Circuit Judge

_____

Affirmed by published opinion. Judge Hamilton wrote the opinion, in
which Judge Widener and Senior Judge Phillips joined.

_____

**COUNSEL**

**ARGUED:** John Henry Blume, III, Columbia, South Carolina; David
Paul Voison, Columbia, South Carolina, for Appellant. Lauri J. Soles,

Assistant Attorney General, Columbia, South Carolina, for Appellees.
**ON BRIEF:** Charles Molony Condon, Attorney General, John W. McIntosh, Deputy Attorney General, Donald J. Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees.

_____

## OPINION

HAMILTON, Circuit Judge:

Petitioner, Earl Matthews, Jr., appeals the district court's denial of his petition for writ of habeas corpus, see 28 U.S.C. § 2254. Finding no error, we affirm.

I

A

On the evening of October 29, 1984, Lucia Aimar and her boyfriend, Eric Burn, purchased their dinner at a drive-through restaurant in Charleston, South Carolina. While the couple was parked in a nearby parking lot eating their dinner, Matthews approached the driver's side of the car where Burn was seated. Matthews pulled out a handgun, pointed it at Burn's head, and demanded money. While Burn was searching for money, Matthews struck Burn across the face, breaking his nose. After Burn found five dollars in Aimar's purse, Burn handed the purse to Matthews.

Next, Matthews walked around to the passenger's side of the car where Aimar was seated. Aimar locked the door and tried to roll up the window. Matthews prevented Aimar from rolling up the window and asked for a ride. When Burn refused, Matthews shot Aimar in the head and shot Burn in the chest. As a result of her injuries, Aimar died. Burn recovered from his chest wound and later testified at Matthews' trial.

B

Following a jury trial, Matthews was convicted of the capital murder of Aimar, armed robbery, attempted armed robbery, assault and battery with intent to kill, and unlawful possession of a handgun.

2

On the murder count, on the recommendation of the jury, Matthews was sentenced to death. For the remaining offenses, Matthews received consecutive sentences totaling sixty-six years.

On direct appeal, the Supreme Court of South Carolina affirmed Matthews' convictions, but vacated his death sentence because of a Skipper violation,**1** and remanded the case for a new sentencing trial. See State v. Matthews, 353 S.E.2d 444, 450 (S.C. 1986). On remand, the jury again recommended a sentence of death, and Matthews was sentenced accordingly. This sentence was affirmed by the Supreme Court of South Carolina. See State v. Matthews , 373 S.E.2d 587, 596 (S.C. 1988). Matthews then petitioned the Supreme Court of the United States for a writ of certiorari. The Supreme Court of the United States denied the petition. See Matthews v. South Carolina, 489 U.S. 1091 (1989).

Matthews then filed a state application for post-conviction relief, which the state trial court denied on August 24, 1992. The Supreme Court of South Carolina denied discretionary review, and, on May 31, 1994, the Supreme Court of the United States denied Matthews' second petition for writ of certiorari. See Matthews v. South Carolina, 114 S. Ct. 2155 (1994).

On August 30, 1994, Matthews filed a petition for writ of habeas corpus in the United States District Court for the District of South Carolina. The case was assigned to a magistrate judge, who, in a 124-page report and recommendation, recommended to the district court that it deny the petition. After de novo review of the record, the district court adopted the magistrate judge's report and recommendation and denied the petition. Matthews noted a timely appeal.

II

On appeal, Matthews raises numerous assignments of error. We shall address each of these assignments of error in turn.

_____

**1** In Skipper v. South Carolina , 476 U.S. 1, 4-8 (1986), the Supreme Court held that the defendant's Eighth and Fourteenth Amendment rights were violated by the sentencing court's refusal to admit evidence of his adaptability to prison life.

A

Matthews argues that the Ninth Circuit Solicitor, Charles Condon, who is now the Attorney General of South Carolina, utilized his discretion in seeking the death penalty in this case in a racially discriminatory manner. In support of his contention that Mr. Condon sought the death penalty against him in a discriminatory manner, Matthews relies on statistical evidence and numerous alleged racist acts committed by Mr. Condon, both in his personal and professional life. In response, the State argues that the claim is procedurally barred because it was never presented in state court, and, in the alternative, is without merit. We agree with the State that this claim is procedurally barred and, therefore, decline to address the merits. See Karsten v. Kaiser Found. Health Plan, 36 F.3d 8, 11 (4th Cir. 1994) (per curiam) (noting that alternative holdings should be avoided).

In the interest of giving state courts the first opportunity to consider alleged constitutional errors occurring in a defendant's state trial and sentencing, a § 2254 petitioner is required to "exhaust" all state court remedies before a federal district court can entertain his claims. 28 U.S.C. § 2254(b) & (c); see also Rose v. Lundy, 455 U.S. 509, 518 (1982) (noting that "[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state court proceedings"). Thus, a federal habeas court may consider only those issues which have been "fairly presented" to the state courts. Picard v. Connor , 404 U.S. 270, 275-78 (1971); see also Townes v. Murray, 68 F.3d 840, 846 (4th Cir. 1995), cert. denied, 116 S. Ct. 831 (1996). A claim is fairly presented when the petitioner presented to the state courts the "`substance' of his federal habeas corpus claim." Anderson v. Harless, 459 U.S. 4, 6 (1982) (per curiam) (quoting Picard, 404 U.S. at 278). "`The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined. Oblique references which hint that a theory may be lurking in the woodwork will not'" suffice. Mallory v. Smith, 27 F.3d 991, 995 (4th Cir.) (quoting Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988)), cert. denied, 115 S. Ct. 644 (1994). In other words, fair presentation contemplates that "both the operative facts and the `controlling legal principles'" must be presented to the state court. Verdin v. O'Leary, 972 F.2d 1467, 1474 (7th Cir. 1992) (quoting Picard, 404 U.S. at 277); see also Joubert v. Hopkins, 75 F.3d

4

1232, 1240 (8th Cir.) ("A claim has been fairly presented when a petitioner has properly raised the `same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition."), cert. denied, 116 S. Ct. 2574 (1996).

To satisfy the exhaustion requirement, a habeas petitioner must fairly present his claim to the state's highest court. See Spencer v. Murray, 18 F.3d 237, 239 (4th Cir. 1994) (denying certain claims on exhaustion principles where claims were not raised on direct appeal to the Virginia Supreme Court); see also Levine v. Comm'r of Correctional Serv., 44 F.3d 121, 124 (2d Cir. 1995); Story v. Kindt, 26 F.3d 402, 405 (3d Cir.), cert. denied, 115 S. Ct. 593 (1994); James v. Borg, 24 F.3d 20, 24 (9th Cir.), cert. denied, 115 S. Ct. 333 (1994); Deters v. Collins, 985 F.2d 789, 795 (5th Cir. 1993); Manning v. Alexander, 912 F.2d 878, 881 (6th Cir. 1990). The burden of proving that a claim has been exhausted lies with the petitioner. Mallory, 27 F.3d at 994.

The exhaustion requirement, though not jurisdictional, Granberry v. Greer, 481 U.S. 129, 131 (1987), is strictly enforced, Rose, 455 U.S. at 522. Consequently, when a petition includes both exhausted and unexhausted claims, the district court must dismiss the entire petition. See id. ("[W]e hold that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims."). However, the exhaustion requirement for claims not fairly presented to the state's highest court is technically met when exhaustion is unconditionally waived by the state, Sweezy v. Garrison , 694 F.2d 331, 331 (4th Cir. 1982) (per curiam), cert. denied, 461 U.S. 908 (1983), or when a state procedural rule would bar consideration if the claim was later presented to the state court, Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991); Teague v. Lane, 489 U.S. 288, 297-98 (1989); see also George v. Angelone, 100 F.3d 353, 363 (4th Cir. 1996) ("A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally defaulted under state law if the petitioner attempted to raise it at this juncture."); Bassette v. Thompson, 915 F.2d 932, 937 (4th Cir. 1990) (If "it is clear that the state law would bar state review, exhaustion is not required, and federal review is precluded."), cert. denied, 499 U.S. 982 (1991). The state procedural bar rule barring federal review must be independent and adequate to support the state court judgment. See Coleman, 501 U.S. at 729 ("This Court will not

5

review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."). A state procedural bar rule is not adequate unless it is "consistently or regularly applied." Johnson v. Mississippi, 486 U.S. 578, 589 (1988).

The district court found that although Matthews had not specifically raised the claim that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in a racially discriminatory manner, the claim was nonetheless exhausted for federal habeas corpus purposes. Apparently, the district court reasoned that the exhaustion requirement was satisfied when Matthews raised this issue in a pre-trial motion[2] and the state court denied the motion.[3]

For two reasons, we believe the district court erred when it concluded this claim was exhausted for federal habeas corpus purposes. First, the claim was not exhausted because it was not presented to the Supreme Court of South Carolina. In the absence of such an attempt by Matthews, the claim is unexhausted. See Spencer, 18 F.3d at 239;

---

[2] In this motion, Matthews argued that application of the South Carolina Death Penalty Statute was:

> unconstitutional, on its face, and as applied in this case, . . . as violative of the guarantees of due process of law and equal protection of the law, and guarantees against cruel and unusual punishments contained in the South Carolina Constitution and United States Constitution.

Appendix to Second Petition for Writ of Certiorari to the Supreme Court of South Carolina at 1733. The motion suggests that the South Carolina Death Penalty Statute violated the Equal Protection Clause because the statute confers to the prosecutor "the complete and unbridled discretion in the first instance as to whether the death penalty will be sought in any particular case." Id. at 1734.

[3] It is noteworthy that, in addition to other innumerable materials "vital to the understanding of the basic issues on appeal," Local Rule 30(b), a copy of this motion is not contained in the joint appendix filed in this case. In this circuit, we consider "the coordination of preparing the appendix to be the responsibility of both sides," Local Rule 30(c). And, in our view, neither party, especially the State, has lived up to its responsibilities.

6

see also Levine, 44 F.3d at 124; Story, 26 F.3d at 405; James, 24 F.3d at 24; Deters, 985 F.2d at 795; Manning , 912 F.2d at 881. Second, Matthews' claim--that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in a racially discriminatory manner --was not "fairly presented" in state court. Matthews' pre-trial motion contained a very broad assertion that the South Carolina Death Penalty Statute violated the Equal Protection Clause because the statute conferred too much discretion in seeking the penalty on the prosecutor. That claim is clearly not the "substance" of the claim presently asserted by Matthews in federal court--that the Ninth Circuit Solicitor's decision to seek the death penalty in this case was racially motivated. Indeed, the record is bereft of evidence that"both the operative facts and the `controlling legal principles'" of Matthews' claim raised here were presented to the state court. Verdin , 972 F.2d at 1474 (quoting Picard, 404 U.S. at 277).

Matthews argues that this claim was nonetheless exhausted for federal habeas corpus purposes because the Supreme Court of South Carolina reviewed his case in favorem vitae (in favor of life). Under in favorem vitae review, the Supreme Court of South Carolina reviews "`the entire record for legal error, and assume[s] error when unobjected-to but technically improper arguments, evidence, jury charges, etc. are asserted by the defendant on appeal in a demand for reversal or a new trial.'" Kornahrens v. Evatt, 66 F.3d 1350, 1362 (4th Cir. 1995) (quoting State v. Torrence, 406 S.E.2d 315, 324 (S.C. 1991) (Toal, J., concurring for a majority of the court)), cert. denied, 116 S. Ct. 1575 (1996).4 "Under in favorem vitae review, `the appellate court searches the record for error without regard to whether an objection has preserved it.'" Id. (quoting Torrence, 406 S.E.2d at 326 (Toal, J., concurring for a majority of the court)). As Matthews' argument goes, although this argument was not raised directly to the Supreme Court of South Carolina, the claim was raised prior to trial, and, therefore, the Supreme Court of South Carolina reviewed this claim on direct appeal when it conducted its in favorem vitae review.

In Kornahrens, we rejected the petitioner's contention that in favorem vitae review preserved his contentions that certain jury

_____

4 In favorem vitae review has been abolished in the State of South Carolina. Kornahrens, 66 F.3d at 1362.

instructions at trial and sentencing were erroneous for purposes of federal habeas corpus review. 66 F.3d at 1362-63. In reaching this conclusion, we reasoned:

> Because our role is limited to reviewing state-court judgments, federal review is inappropriate if a prisoner failed to raise his claim and have it reviewed by a state court. Even with in favorem vitae review, unless the prisoner raises the specific objections before the state court, we cannot determine whether the state court has properly applied federal constitutional principles, or for that matter, whether the state court has even considered these issues at all. In short, we have no state court judgment to review.

Id. at 1362.

The reasoning of Kornahrens is applicable here. The gist of Kornahrens is that in favorem vitae review does not supply the necessary exhaustion for claims not raised on direct appeal to the Supreme Court of South Carolina. Therefore, because Matthews' claim that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in a racially discriminatory manner was not raised on direct appeal, the Supreme Court of South Carolina's in favorem vitae review of the record of Matthews' sentencing retrial did not exhaust this claim for purposes of federal habeas corpus review.

Matthews also argues that this claim was exhausted for federal habeas corpus purposes because the Supreme Court of South Carolina considered this claim pursuant to its statutory duty to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." S.C. CODE ANN. § 16-3-25(C)(1).

The issue of whether a claim not raised on direct appeal can be exhausted for federal habeas corpus purposes if the claim falls within a class of claims for which the state supreme court is statutorily required to review is a question unresolved in this circuit. See Bennett v. Angelone, 92 F.3d 1336, 1345 & n.6. (4th Cir. 1996) (declining to address petitioner's contention that his claims challenging the prosecutor's sentencing-phase arguments and the constitutionality of Vir-

8

ginia "vileness" aggravating circumstance were exhausted even though not raised on direct appeal to the Virginia Supreme Court because the court necessarily reviewed these claims as part of its mandatory review). At least one circuit has held that a claim not raised on direct appeal can be exhausted for federal habeas corpus purposes if the claim falls within a class of claims for which the state supreme court was statutorily required to review. See Beam v. Paskett, 3 F.3d 1301, 1306-07 (9th Cir. 1993), cert. denied, 116 S. Ct. 1631 (1994). In Beam, the petitioner failed to raise his claim that the sentencing judge's application of the "continuing threat" aggravating circumstance to him was unconstitutional on direct appeal to the Idaho Supreme Court. Id. at 1306. Beam's claim was based on his contention that the sentencing judge's reliance on Beam's past non-violent, consensual or involuntary sexual conduct rendered the application of the "continuing threat" aggravating circumstance to him unconstitutional. Even though this claim was not raised before the Idaho Supreme Court, the Ninth Circuit held the claim was exhausted for federal habeas corpus purposes because the claim fell within a class of claims for which the Idaho Supreme Court was required to review when examining Beam's death sentence. Id. at 1306-07. Under Idaho law, the Idaho Supreme Court was required to determine if Beam's death sentence was "imposed under the influence of passion, prejudice, or any other arbitrary factor." Id. at 1306. Under this review, Idaho law required the court to consider certain types of errors occurring at sentencing that were not raised or objected to at trial. Id. The Ninth Circuit interpreted the mandatory review conducted by the Idaho Supreme Court in Beam's case to include a review of the constitutionality of the sentencing judge's application of the "continuing threat" aggravating circumstance to Beam. Id. at 1307. The court reasoned that the sentencing judge's reliance upon Beam's past non-violent, consensual or involuntary sexual conduct in violation of the Eighth Amendment would "clearly constitute reliance on an arbitrary factor." Id. Accordingly, the court held that, notwithstanding Beam's failure to raise this claim to the Idaho Supreme Court, the claim was exhausted for purposes of federal habeas corpus review. Id.

In Nave v. Delo, the Eighth Circuit addressed a similar claim to that raised in Beam. 62 F.3d 1024, 1038-39 (8th Cir. 1995), cert. denied, 116 S. Ct. 1837 (1996). In Nave, the court held that a jury instruction

9

on mitigating circumstances was not exhausted for federal habeas corpus purposes notwithstanding the existence of a state statute that required the state supreme court to review death sentences to determine if they were "imposed under the influence of passion, prejudice, or any other arbitrary factor." Id. at 1039. The court reached this conclusion because, according to the court, Missouri law, unlike Idaho law controlling in Beam, did not require the Missouri Supreme Court to review Nave's death sentence for "instructional or constitutional error." Id. The court also rejected Nave's contention that the mitigating circumstance instruction was an "arbitrary factor." Id. According to the court, the phrase "arbitrary factor" was "a catch-all that [was] intended to describe possible improper bases for the imposition of the death penalty. This inquiry requires the court to ensure that the aggravating factors relied upon by the jury constitute permissible grounds under state law for imposing the death penalty." Id. The court went on to conclude that Missouri law did not require the Missouri Supreme Court "to review death penalty cases sua sponte for constitutional or instructional errors not specified in the direct appeal." Id.

Matthews asks us to hold that his claim that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in a racially discriminatory manner was exhausted for federal habeas corpus purposes because the Supreme Court of South Carolina necessarily reviewed this claim when it reviewed his death sentence pursuant to its mandatory review under § 16-3-25(C)(1).

For purposes of our discussion, we will assume without deciding that a claim not raised on direct appeal can be exhausted for federal habeas corpus purposes if the claim falls within a class of claims for which the state supreme court is statutorily required to review.[5] This assumption, however, is of no help to Matthews.

The Supreme Court of South Carolina reviews a death sentence under § 16-3-25(C)(1) to determine "[w]hether the sentence of death

_____

[5] We recognized in Bennett that "the spirit of Kornahrens is counter" to the notion that a claim not raised on direct appeal can be exhausted for federal habeas corpus purposes if the claim falls within a class of claims for which the state supreme court is statutorily required to review. 92 F.3d at 1345 n.6.

10

was imposed under the influence of passion, prejudice, or any other arbitrary factor." The review conducted by the Supreme Court of South Carolina under this mandate is for claims falling within the class of claims covered by this statutory provision. It follows that, at a minimum, only those claims falling within the class of claims covered by § 16-3-25(C)(1) that _appear_ in the trial record are reviewed by the Supreme Court of South Carolina and, consequently, exhausted for federal habeas corpus purposes. Cf. Beam, 3 F.3d at 1306-07 (claim that the sentencing judge erroneously applied the "continuing threat" aggravating circumstance to Beam discernible from the record before the Idaho Supreme Court). In short, if a claim allegedly falling within the scope of § 16-3-25(C)(1) does not appear in the trial record, there is nothing for the Supreme Court of South Carolina to review under that section.

Matthews' claim that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in a racially discriminatory manner did not appear in the record before the Supreme Court of South Carolina because the claim was never raised in state court. Indeed, there were no facts developed in the trial record that suggested the Ninth Circuit Solicitor's decision to seek the death penalty was racially motivated. Therefore, the claim could not have been reviewed by the Supreme Court of South Carolina through its mandatory review under § 16-3-25(C)(1).

Because Matthews' claim is not exhausted for purposes of federal habeas corpus review, Matthews' habeas corpus petition should be dismissed unless the state unconditionally waived exhaustion, see Sweezy, 694 F.2d at 331, or a South Carolina procedural rule would bar consideration if the claim was later presented to the South Carolina state courts, see Coleman, 501 U.S. at 735 n.1; Teague, 489 U.S. at 297-98; George, 100 F.3d at 363; Bassette, 915 F.2d at 937. The State has not unconditionally waived exhaustion, so we are left with the question of whether a South Carolina procedural rule would bar consideration of this claim if it were presented to the Supreme Court of South Carolina.

S.C. CODE ANN. § 17-27-90 provides in relevant part:

> All grounds for relief available to an applicant under this chapter must be raised in his original, supplemental or

11

> amended application. Any ground finally adjudicated or not
> so raised . . . may not be the basis for a subsequent applica-
> tion, unless the court finds a ground for relief asserted which
> for sufficient reason was not asserted or was inadequately
> raised in the original, supplemental or amended application.

According to the Supreme Court of South Carolina,§ 17-27-90 "for-
bids a successive PCR application unless an applicant can point to a
`sufficient reason' why the new grounds for relief he asserts were not
raised, or were not raised properly" in the first post-conviction relief
application (PCR). Aice v. State, 409 S.E.2d 392, 394 (S.C. 1991). In
other words, the applicant must point to facts and circumstances that
demonstrate "why the new grounds were not and could not have been
raised" in the first PCR application. Arnold v. State, 420 S.E.2d 834,
843 (S.C. 1992), cert. denied, 507 U.S. 927 (1993); see also Hunter
v. State, 244 S.E.2d 530, 533 (S.C. 1978) (successive application
barred where applicant was aware of claim at the time of the filing
of prior applications but did not raise it); cf. Aice, 409 S.E.2d at 394
("[T]he contention that prior PCR counsel was ineffective is not per
se a `sufficient reason' allowing for a successive application under
§ 17-27-90); Land v. State, 262 S.E.2d 735, 737 (S.C. 1980) (appli-
cant's conclusory assertion that PCR counsel was"inadequate" held
not a "sufficient reason" warranting a successive application).

The Supreme Court of South Carolina, however, has entertained
successive applications in cases in which the successive claims poten-
tially could have been raised in the first PCR application. These cases
involve very rare procedural circumstances. For example, the
Supreme Court of South Carolina permitted a successive application
where the applicant did not have counsel to assist in the preparation
of his first PCR application. See Case v. State , 289 S.E.2d 413, 413-
14 (S.C. 1982) (court permitted a successive application where the
applicant's first PCR application was filed without the benefit of
counsel and was dismissed without a hearing). In another case, the
Supreme Court of South Carolina permitted a successive application
where the applicant did not have PCR counsel that differed from his
trial counsel. See Carter v. State, 362 S.E.2d 20, 20-21 (S.C. 1987)
(court permitted a successive application where the applicant raised
the issue of ineffective assistance of trial counsel in his successive
application and trial counsel represented the applicant during his first

12

PCR application). Finally, the Supreme Court of South Carolina permitted a successive application where the applicant, due to "so many procedural irregularities," did not have direct review of a claim he brought in his first and second PCR applications. Washington v. State, 1996 WL 663770, at *2 (S.C. November 12, 1996). **6**

_____

**6** In Washington, Washington's direct appeal was dismissed because his attorney failed to file an initial brief. 1996 WL 663770, at *1. In his first PCR application, Washington raised numerous issues including one related to the State's misconduct in connection with a plea agreement. Id. The PCR court found that Washington did not waive his right to direct appeal and should be afforded the opportunity to appeal. As to the State's misconduct, the PCR court found that the State failed to adequately explain to the jury the State's relationship with one of its witnesses; nonetheless, the PCR court refused to grant a new trial, opining that the claim could be raised on direct appeal. Id. Washington sought review of his misconduct claim before the Supreme Court of South Carolina, but the Supreme Court of South Carolina denied his petition for writ of certiorari as to that issue. Washington then filed a second PCR application, again raising the misconduct issue. Id. Before the PCR court, Washington also filed a motion to alter or amend the order denying his first PCR application. The PCR court granted the motion to amend, and amended its order to grant Washington a new trial. Id.  Before the Supreme Court of South Carolina, the State contended that § 17-27-90 barred Washington's second PCR application. The court rejected this contention. Although the court recognized that Washington's second PCR application was successive "under a hyper-technical analysis," the court concluded that § 17-27-90 did not bar Washington's second PCR application because of "the unique factual circumstances" presented. Id. at *2. The "unique factual circumstances" were:

> He did not have the benefit of a direct appeal, because his attorney failed to file an appellate brief. Moreover, the first PCR court decided, in effect, that Washington was entitled to a new trial, but allowed the relief to be addressed on direct appeal; however, this Court denied certiorari as to the question. Additionally, the second PCR court granted relief, but did so through an improper procedure, specifically, by amending the first order. Thus, Washington has never received the benefit of a direct review. Even if his application is successive, the unique combination of facts in this case entitle him to the relief granted below.

Id.

13

The South Carolina case law discussed above demonstrates that, absent sufficient reason for not raising a claim in a first PCR application or very rare procedural circumstances, § 17-27-90 bars the claim in a successive application. This interpretation is consistent with the Supreme Court of South Carolina's commitment to ensure that all defendants have a full and fair opportunity to present claims in one PCR application, thereby preventing an applicant from receiving more than "one bite at the apple as it were." Gamble v. State, 379 S.E.2d 118, 119 (S.C. 1989). In Case, Carter, and Washington, the applicant never received a full bite at the apple because the applicant was essentially prevented--through no fault of his own--from fairly presenting his claims and/or having his claims adjudicated in the initial PCR application. In contrast, the applicants in Arnold and Hunter had a full bite at the apple. And the applicants in Aice and Land were presumed to have a full bite at the apple absent a specific showing of facts and circumstances that PCR counsel was ineffective.

In this case, Matthews had a full bite at the apple. During his state PCR proceeding, he enjoyed the benefit of competent counsel, a hearing, and a full and fair adjudication of his claims. In this court, he has not demonstrated a "sufficient reason" why his claim that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in this case in a racially discriminatory manner was not raised in his state PCR application. In addition, Matthews has failed to demonstrate that his case is on the same procedural playing field as Case, Carter, or Washington. Accordingly, we are convinced beyond doubt that if this claim was presented to the Supreme Court of South Carolina, the claim would be barred as successive under § 17-27-90.

We may excuse Matthews' procedural default if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. The "fundamental miscarriage of justice" exception is available to those who are actually innocent. Murray v. Carrier, 477 U.S. 478, 495-96 (1986). The exception is also available to those who are actually innocent of the death penalty. Sawyer v. Whitley, 505 U.S. 333, 350 (1992). To be actually innocent of the death penalty, the petitioner must prove by clear and convincing evi-

14

dence that but for the constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty. Id.

The record is clear that Matthews has not established cause for the default or that a fundamental miscarriage of justice would result by our failure to consider his claim. Therefore, we cannot address the merits of his claim that the Ninth Circuit Solicitor utilized his discretion in seeking the death penalty in a racially discriminatory manner.

B

Matthews argues that the prosecutor's use of peremptory challenges to exclude black veniremen from the sentencing jury at his sentencing retrial violated his equal protection rights. The Supreme Court has held that it is "impermissible for a prosecutor to use his challenges to exclude blacks from the jury `for reasons wholly unrelated to the outcome of the particular case on trial' or to deny blacks `the same right and opportunity to participate in the administration of justice enjoyed by the white population.'" Batson v. Kentucky, 476 U.S. 79, 91 (1986) (quoting Swain v. Alabama, 380 U.S. 202, 224 (1965)).

When a Batson challenge is made, the trial court must conduct a three-part inquiry. First, the opponent of the challenge has to make out a prima facie case of discrimination. Hernandez v. New York, 500 U.S. 352, 358 (1991) (plurality opinion); Batson , 476 U.S. at 96.[7] Second, if a prima facie case of discrimination is made, the burden then shifts to the proponent of the challenge to come forward with a neutral explanation for the challenge. Hernandez , 500 U.S. at 358-59; Batson, 476 U.S. at 97. The explanation need not be "persuasive, or even plausible," as long as it is neutral. Purkett v. Elem, 115 S. Ct.

_____

[7] For a defendant to establish a prima facie violation of racial discrimination in the use of peremptory challenges, the defendant must show that: (1) "he is a member of a cognizable racial group"; (2) "that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"; and (3) "that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Batson, 476 U.S. at 96.

15

1769, 1771 (1995). In other words, unless a discriminatory intent is inherent in the explanation offered to defend a peremptory challenge, "`the reason offered will be deemed race neutral.'" Id. (quoting Hernandez, 500 U.S. at 360). Third, if parts one and two are satisfied, the trial court must then decide whether the opponent of the strike has proved "purposeful discrimination." Id. at 1771. The ultimate burden always rests with the opponent of the challenge to demonstrate purposeful discrimination. Hernandez, 500 U.S. at 363-64. Because the findings of the trial court turn largely on credibility determinations, they are given great deference. Id. at 364-65.

At Matthews' sentencing retrial, the prosecutor used all of his peremptory challenges to exclude five blacks, Carl Ellis, Nellie Frazier, Joe Ann Hunt, Patricia Middleton, and Rebecca McDonald. The prosecutor's challenges resulted in a jury of seven whites and five blacks. Matthews' counsel then made a motion for mistrial under the authority of Batson. The sentencing judge questioned whether a prima facie case of discrimination was made in view of the fact that five blacks were on the jury,[8] but nonetheless required the prosecutor to state his reasons for the challenges.

The prosecutor then explained his reasons for the challenges. Ellis was struck because: (1) he "indicated it really wasn't his decision [to impose the death penalty]; that he would let the Lord make that decision and whatever the Lord told him to do he would do" and (2) he "had a criminal record." Transcript of Sentencing Retrial at 524-25. Frazier was struck because she was the mother of a State (South Carolina) Law Enforcement Division agent who was a good friend of a prospective state witness, detective Chevy Harris. Joe Ann Hunt was struck because she had "at least fifty fraudulent check convictions." Id. at 526. Middleton was struck because she equivocated repeatedly about her ability to impose the death penalty, stating once that she

_____

[8] A Batson violation can occur notwithstanding the fact that members of the defendant's racial group are seated on the jury. "[S]triking only one black prospective juror for a discriminatory reason violates a black defendant's equal protection rights, even when other black jurors are seated and even when valid reasons are articulated for challenges to other black prospective jurors." United States v. Lane, 866 F.2d 103, 105 (4th Cir. 1989).

16

could not impose the death penalty under any circumstances and later stating that she thought she could. Finally, McDonald was struck because she lived on the same street as Matthews and knew some of his family, including Matthews' grandmother.

Matthews offered no rebuttal evidence that the prosecutor's justifications for exercising the challenges were a pretext for discrimination. Thereafter, the sentencing judge found that the prosecutor's explanation "justif[ied] the striking" of the five black veniremen. Id. at 528.

Because the prosecutor offered a race-neutral explanation in response to Matthews' objection, the preliminary issue of whether Matthews established a prima facie case of discrimination is moot. See Hernandez, 500 U.S. at 359. As to the prosecutor's reasons for the challenges, all of the reasons advanced by the prosecutor were facially neutral--the reasons set forth by the prosecutor are clearly unrelated to the race of the veniremen. Under Purkett and Hernandez, that is all the law requires. Purkett, 115 S. Ct. at 1771; Hernandez, 500 U.S. at 359-60. Moreover, there has been no showing that the reasons set forth by the prosecutor were pretextual. Indeed, Matthews made no attempt to show pretext at trial.

Matthews argues that similarly situated white jurors were not struck by the prosecutor, and, therefore, the facially neutral reasons set forth by the prosecutor were a pretext for intentional discrimination. This argument must be rejected.

To begin with, Batson is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not. Burks v. Borg, 27 F.3d 1424, 1427 (9th Cir. 1994), cert. denied, 115 S. Ct. 1122 (1995). This is so because counsel must be entitled to make credibility determinations in exercising peremptory challenges. Indeed,

> counsel is entitled to take account of the characteristics of the other prospective jurors against whom peremptory challenges might be exercised; to reevaluate the mix of jurors and the weight he gives to various characteristics as he begins to exhaust his peremptory challenges; and to take into account tone, demeanor, facial expression, emphasis--

17

> all those factors that make the words uttered by the prospective juror convincing or not.

Id. at 1429.

In any event, the white jurors complained of by Matthews were not similarly situated to the black jurors whom the prosecutor challenged. As to Ellis and Hunt, the record is devoid of evidence that any white juror seated had a criminal record. As to Frazier, there is no evidence that any white juror had a member of their immediate family who was friends with a prospective witness. With respect to Middleton, Matthews argues that several white jurors who also expressed some reservations about imposing the death penalty were not struck. However, comparison of Middleton to these jurors is inappropriate because to the extent that these white jurors expressed doubts about imposition of the death penalty, their doubts were unmistakably not as strong as Middleton's. Accordingly, Ellis, Hunt, Frazier, and Middleton were not similarly situated to any of the white jurors seated. Finally, Matthews argues that McDonald was similarly situated with a white juror who was not struck, Athena Gazes, because Gazes was the aunt of one of Matthews' counsel's partners. McDonald and Gazes were not similarly situated for the obvious reason that living on the same street of the defendant and being acquainted with his family, as McDonald was, is dissimilar to being the aunt of one of Matthews' counsel's partners. In summary, in the absence of any evidence of pretext, there was simply no intentional discrimination in the selection of the sentencing jury at Matthews' sentencing retrial.

C

Matthews contends that the district court erred when it concluded that counsel provided effective assistance at his sentencing retrial. According to Matthews, his counsel were ineffective for failing: (1) to investigate and present evidence of his brain damage due to exposure to lead and (2) to redact portions of letters written by Matthews that were introduced into evidence.

The test for reviewing claims of ineffective assistance of counsel is well established. First, the petitioner must demonstrate counsel's performance fell below an objective standard of reasonableness.

18

Strickland v. Washington, 466 U.S. 668, 687-91 (1984). In other words, the petitioner must demonstrate counsel's performance was "deficient." Griffin v. Warden, 970 F.2d 1355, 1357 (4th Cir. 1992). "`Deficient performance'" is not merely below-average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance. Id. Second,"[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland , 466 U.S. at 694. "Because effectiveness of counsel is a mixed question of law and fact, we owe no special deference to the finding of the state court on the question." Griffin, 970 F.2d at 1357. Finally, we must presume counsel's assistance was effective:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland, 466 U.S. at 689 (citation and internal quotes omitted).

1

Matthews claims that because he lived in "one of the most lead contaminated houses in the most lead contaminated neighborhood[ ] in the most lead contaminated city in the United States," Petitioner's Brief at 51-52, and showed various signs of brain damage due to lead exposure,[9] his counsel at his sentencing retrial were constitutionally

_____

[9] These signs included, among others, poor school performance records, low I.Q. scores, and Matthews' attention deficit disorder.

19

ineffective for failing to investigate, develop, and present evidence of his brain damage due to lead exposure. As Matthews' argument goes, had his counsel (Michael O'Connell and Michael Scardato) presented evidence of his brain damage due to lead exposure, the jury would have found this to be a mitigating factor, resulting in a sentence of life imprisonment. We disagree.

With respect to investigating mitigating evidence, counsel's performance is deficient if he fails to make a reasonable investigation for possible mitigating evidence. See Lambrix v. Singletary, 72 F.3d 1500, 1504 (11th Cir. 1996). In the context of whether an attorney's investigation into matters that might aid his client constitutes a deficient performance, the Supreme Court has said:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically upon such information. . . . [W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland, 466 U.S. at 690-91.

In this case, counsel for Matthews undertook substantial efforts to find mitigating evidence, enlisting the aid of two experts, a psychia-

20

trist, Dr. John Outz, III, and a psychologist, Dr. Gordon Kimbrell, interviewing numerous family members, and reviewing all of Matthews' school and social service records, and records of his earlier encounters with the law. Throughout the entire investigation into mitigating evidence, counsel for Matthews were never given information that Matthews suffered from brain damage due to lead exposure.

At the sentencing retrial, Matthews' case in mitigation focused on his poor upbringing, poor performance in school, low I.Q., and adaptability to prison life. Numerous witnesses testified at the sentencing retrial regarding each of these facts. In all, approximately fifteen witnesses testified on behalf of Matthews at his sentencing retrial.

At the state PCR hearing, Matthews presented voluminous evidence in support of his claim that he suffers from brain damage due to exposure to lead. The PCR court found that Matthews did not suffer from brain damage due to lead exposure. See (J.A. 968) ("I find that Applicant has failed to establish that any brain damage existed in the Applicant at the time of the murder and has failed to establish that the damage, if any, contributed to the Applicant's actions in committing the murder.").

Although counsel has the obligation to conduct a reasonable investigation even if the defendant is reluctant to cooperate, Blanco v. Singletary, 943 F.2d 1477, 1503 (11th Cir. 1991), cert. denied, 504 U.S. 943, 946 (1992), counsel is not deficient for failing to find mitigating evidence if, after a reasonable investigation, nothing has put the counsel on notice of the existence of that evidence, Barnes v. Thompson, 58 F.3d 971, 980 (4th Cir.) (counsel not ineffective for failure to discover defendant's childhood abuse or mental impairment when petitioner and family members gave no indication that such evidence existed), cert. denied, 116 S. Ct. 435 (1995); see also Lambrix, 72 F.3d at 1505-06 (counsel's performance not deficient for failing to investigate and introduce evidence of petitioner's childhood abuse where extensive investigation into mitigating evidence produced no evidence of childhood abuse).

In this case, as noted above, counsels' investigation for the sentencing retrial was extensive. Even after an extensive investigation, including interviews with numerous witnesses, including family

21

members, a psychiatrist and psychologist, counsel had no indication that evidence of brain damage due to lead exposure existed. In short, Matthews has not shown that counsels' failure to investigate and present evidence of brain damage due to lead exposure was constitutionally deficient.**10**

2

Matthews also claims his counsel at his sentencing retrial were ineffective for failing to move the sentencing court to further redact letters written by him that were introduced into evidence. This argument is without merit.

Prior to Matthews' sentencing retrial, he made a motion in limine to exclude two letters written by him following his first trial. The letters covered a variety of subjects, including references to crime, Matthews' potential appeals, and other, more personal information. The sentencing judge denied the motion. Matthews then asked the sentencing judge to redact any references in the letters to the first trial, death row, and his exercise of his appellate rights. The sentencing judge granted this request. At Matthews' sentencing retrial, the redacted letters were introduced into evidence. As redacted, each letter contained profanity and the phrases "sitting down smoking a good joint" and "if I ever get out of this shit." Transcript of Sentencing Retrial at 1323, 1325.

At the PCR hearing, O'Connell testified that he attempted to get any damaging information removed from the letters but, as was evidenced from the sentencing judge's ruling that the letters were admissible, he was not going to prevent the jury from seeing the letters. O'Connell further testified that once the motion to suppress was denied, he asked for redaction of as much as he believed he could get, but preferred not to anger the sentencing judge by asking for deletions he did not believe would be allowed. A judgment call of this kind cer-

_____

**10** In light of our conclusion, we need not address Matthews' argument that the PCR court's finding that he did not suffer brain damage due to lead exposure, which is presumed to be correct under 28 U.S.C. § 2254(d), "lacked even `fair support' in the record." Marshall v. Lonberger, 459 U.S. 422, 432 (1989).

tainly falls within the range of acceptable strategic decision-making and cannot be considered deficient. Cf. United States v. Kozinski, 16 F.3d 795, 813 (7th Cir. 1994) (decision whether to call witness afforded "enormous deference"); Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir. 1977) (decision to call witness a tactical decision).**11**

D

Matthews contends that the sentencing judge's refusal to answer voir dire questions prior to his sentencing retrial violated his constitutional right to a fair trial. We disagree.

Prior to his sentencing retrial, Matthews made a motion requesting the sentencing judge to submit to voir dire examination on:

> the Court's attitude toward the death penalty in general, the appropriateness of the death penalty in this case, whether the Court has expressed public opinions about the death penalty and what those opinions are, whether the Court was called on to vote on legislation concerning the death penalty while the Court was a member of the legislature and what that vote or votes were, whether the Court has any connection with the family of the deceased victim in this case, whether the Court's knowledge of this case through any means public or not would have any effect on the Court's decision on the appropriate penalty in this case and what that effect would be, whether the Court could consider a sentence of life imprisonment in a case of this type.

Appendix to Second Petition for Writ of Certiorari to the Supreme Court of South Carolina at 1727. According to Matthews, the purpose of the motion was to assist him in deciding whether to be resentenced

_____

**11** Matthews also argues that his counsel were ineffective for failing to investigate and present evidence of the effect of Matthews' mother's alcoholism, neglect, and emotional abuse on him. This argument is without merit. The record reflects that counsel for Matthews investigated Matthews' background, were aware of Matthews' mother's alcoholism and his poor upbringing, and presented evidence along these lines at the sentencing retrial.

23

by a jury or a judge. See S.C. ANN. § 16-3-25(E) (providing trial by jury for capital defendant's resentencing unless the capital defendant waives trial by jury). The sentencing judge offered the following response to the motion:

> The only thing I can state in that regard is I was in the legis-lature when the death penalty was, quote, reenacted, and I voted in favor of that. . . .
>
> I don't know anybody with the family. I've never met any-body in the family at all. The only knowledge I have is from the newspaper accounts back at that time. . . .
>
> How I feel about the appropriateness of the death penalty in this case, whether I've expressed public opinions about the death penalty, what those opinions are; whether I would consider a life imprisonment--those types of things. I would decline to answer that.

Transcript of Sentencing Retrial at 44-45.

Prior to the commencement of voir dire examination, the issue was raised again. At that time, the sentencing judge stated:

> As a member of the judiciary, [I am], of course, governed by certain requirements. A jury in and of themselves--they are not subject to the rules of ethical standards that judges are and the case law and other requirements placed upon a judge.
>
> Because of that, I would say that I could not preside over a case unless--if I felt I was anything less than impartial in regard to the Defendant and the facts of the case. As you know, I would obviously be required to recuse myself. That's the position that I'm in in this case, that if I felt that I would have any reason to recuse myself then I would do so.
>
> But I am not going to establish and do not think I should or that it would be appropriate for me to establish precedent by

24

allowing voir dire of judges. So I decline to do that but with the statement that if there was any question about impartiality I would recuse myself from the case.

Id. at 90-91.

On direct appeal, the Supreme Court of South Carolina rejected Matthews' contention that the sentencing judge's refusal to answer voir dire questions prior to his sentencing retrial violated his constitutional right to a fair trial, explaining:

> This State's capital sentencing scheme contains no provision for voir dire examination of a trial judge, nor do we believe one is necessary. A judge's oath requires him to follow and uphold the law in all cases, including capital cases. Had appellant waived the jury and chosen sentencing by the court, the judge would have been required to consider applicable mitigating and aggravating circumstances under§ 16-3-20(C) before imposing a sentence. The judge is entitled to a presumption that he would have done so, regardless of his "personal beliefs" about capital punishment. The judge here did not abuse his discretion in refusing to submit to voir dire examination.

State v. Matthews, 373 S.E.2d at 590.

We agree with the Supreme Court of South Carolina that Matthews' claim lacks merit. We are aware of no authority, federal or state, that requires a trial judge to submit to voir dire examination. In addition, we see no plausible reason to create such a rule in this case. This is especially true since South Carolina law provides an appropriate vehicle to obtain recusal of a judge if the facts and circumstances so warrant. See Rogers v. Wilkins, 267 S.E.2d 86, 87-88 (S.C. 1980) (motion to recuse must be made during proceeding and show actual judicial prejudice pursuant to S.C. App. Ct. R. 501, Code of Jud. Conduct, Canon 3(C)). Finally, if we held that Matthews' constitutional right to a fair trial was violated by the sentencing judge's refusal to answer his proposed voir dire questions, such a holding would certainly constitute a new rule under Teague. See 489 U.S. at 316 (absent

25

two exceptions inapplicable here, new constitutional rules of criminal procedure are not retroactive on collateral review).

E

Finally, Matthews argues that premature juror deliberations at his sentencing retrial deprived him of a fair trial. This claim was not raised in state court. For the reasons stated in Part IIA of this opinion, we are procedurally barred from reviewing this claim.

III

For the reasons stated herein, the judgment of the district court is affirmed.**12**

AFFIRMED

_____

**12** The State argues that this appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (April 24, 1996) (the Act). Because Matthews' claims are either procedurally barred or meritless under the more lenient pre-existing standards, we have no occasion to consider whether the Act provides a basis for relief. Indeed, we are confident the Act is of no help to Matthews.